UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW MEXICO

In re:
TROY MICHAEL BAILLIO and
JASMINE BAILLIO,
     Debtors.                                No. 7-08-12171 JA

PHOENIX EQUITY VENTURES, LLC,
     Plaintiff,
v.                                       Adv. No. 08-1124 S

TROY MICHAEL BAILLIO,
     Defendant.

## MEMORANDUM OPINION ON DEFENDANT'S
## MOTION FOR RULE 52(c) DISMISSAL

     This matter came before the Court for trial on the merits of Plaintiff's Complaint. At the conclusion of Plaintiff's case, Defendant orally moved for dismissal, which the Court took under advisement. Defendant's motion will be granted.

     Plaintiff appeared through its attorney Hunt & Davis, P.C. (Chris W. Pierce). Defendant appeared through his attorney Moore, Berkson & Gandarilla, P.C. (George M. Moore). This is a core proceeding to determine dischargeability of a debt. 28 U.S.C. § 157(b)(2)(I). This Memorandum Opinion constitutes the Court's Findings of Fact and Conclusions of Law as may be required by Bankruptcy Rule 7052(a).

     Plaintiff's complaint is based on 11 U.S.C. § 523(a)(2)(A) and (B), which provide:

     (a) A discharge under section 727, 1141, 1228(a),
     1228(b), or 1328(b) of this title does not discharge an
     individual debtor from any debt--
     (1)...

(2) for money, property, services, or an extension,
renewal, or refinancing of credit, to the extent
obtained by--
(A) false pretenses, a false representation, or actual
fraud, other than a statement respecting the debtor's
or an insider's financial condition;[or]
(B) use of a statement in writing--
    (I) that is materially false;
    (ii) respecting the debtor's or an insider's
    financial condition;
    (iii) on which the creditor to whom the debtor is
    liable for such money, property, services, or
    credit reasonably relied; and
    (iv) that the debtor caused to be made or
    published with intent to deceive[.]

Defendant's motion implicates Bankruptcy Rule 7052, which

incorporates Fed.R.Civ.P. 52(c).  Rule 52(c) provides:

**Judgment on Partial Findings.**  If a party has been
fully heard on an issue during a nonjury trial and the
court finds against the party on that issue, the court
may enter judgment against the party on a claim or
defense that, under the controlling law, can be
maintained or defeated only with a favorable finding on
that issue.  The court may, however, decline to render
any judgment until the close of the evidence.  A
judgment on partial findings must be supported by
findings of fact and conclusions of law as required by
Rule 52(a).

A Rule 52(c) motion should be granted either 1) if plaintiff

fails to make out a prima facie case, or 2) despite a prima facie

case, the Court determines that the preponderance of evidence

goes against the plaintiff's claim.  Regency Holdings (Cayman),

Inc. v. The Microcap Fund, Inc. (In re Regency Holdings (Cayman),

Inc.), 216 B.R. 371, 374 (Bankr. S.D.  N.Y. 1998)(Citation

omitted.)  The Court does not draw any special inferences in

nonmovant's favor, nor does the court consider the evidence in

the light most favorable to the nonmoving party.  <u>Id.</u>  (Citations

omitted.)  Rather, the court acts as both judge and jury, weighs

evidence, resolves conflicts, and decides where the preponderance

of the evidence lies.  <u>Id.</u> (Citations omitted.)  <u>See also</u> <u>Follett</u>

<u>Higher Education Group, Inc. v. Berman (In re Berman)</u>, 427 B.R.

432, 434 n. 1 (N.D. Ill. 2010)(same).

**<u>INTRODUCTION</u>**

      In general, after an individual debtor files for
chapter 7 bankruptcy, the bankruptcy court discharges
all of the debtor's pre-existing obligations, absent
the applicability of a statutory exception.  <u>See</u> 11
U.S.C. § 523(a)  (identifying nineteen statutory
exceptions to discharge).  Because exceptions to
discharge are narrowly construed in favor of the debtor
in an effort to further the "fresh start" policy
underlying the Bankruptcy Code, the creditor asserting
an exception to discharge must show that its claim
"comes squarely within an exception enumerated in
Bankruptcy Code § 523(a)."  <u>See</u> <u>Century 21 Balfour Real
Estate v. Menna (In re Menna)</u>, 16 F.3d [7] at 9 [(1st
Cir. 1994)]; <u>see also</u> <u>McCrory v. Spigel (In re Spigel)</u>,
260 F.3d 27, 32 (1st Cir.2001); <u>Palmacci [v. Umpierrez
(In re Umpierrez)]</u>, 121 F.3d [781] at 786 [(1st Cir.
1997)].

      Pursuant to § 523(a)(2), some debts incurred as a
result of the debtor's fraudulent actions or statements
are excepted from discharge.  <u>See</u> 11 U.S.C. §
523(a)(2).  Specifically, § 523(a)(2)(A) excepts from
discharge debts obtained by "false pretenses, a false
representation, or actual fraud, other than a statement
respecting the debtor's or an insider's financial
condition."  11 U.S.C. § 523(a)(2)(A).  Section
523(a)(2)(B), on the other hand, bars the discharge of
a debt obligation obtained by a false written statement
"respecting the debtor's ... financial condition."  <u>See</u>
11 U.S.C. § 523(a)(2)(B).  Based on this statutory
language, discharge claims based on fraudulent written
statements concerning a debtor's financial condition
must be brought pursuant to § 523(a)(2)(B), not §
523(a)(2)(A). In addition: These two subsections of §
523(a) were enacted to address distinct factual

Page -3-

situations.... [T]hey [also] differ with respect to the
element of reliance-that is, the extent to which the
creditor altered its position because of the debtor's
misrepresentations.  Whereas subsection (2)(A) requires
the creditor to prove "justifiable reliance,"
subsection (2)(B) mandates the more demanding showing
of "reasonable reliance."  <u>Colombo Bank v. Sharp (In re
Sharp)</u>, No. 08-1646, 340 Fed.Appx. 899, 2009 U.S.App.
LEXIS 18200 (4th Cir. Aug. 14, 2009) (citing <u>Field [v.
Mans]</u>, 516 U.S. [59] at 66, 116 S.Ct. 437 [1995]).

<u>Douglas v. Kosinski (In re Kosinski)</u>, 424 B.R. 599, 607-08 (1st
Cir. BAP 2010) (footnote omitted). <u>See also</u> <u>Larazon v. Lucas (In
re Lucas)</u>, 386 B.R. 332, 336 n. 5 (Bankr. D. N.M.
2008)(emphasizing fact that sections 523(a)(2)(A) and
523(a)(2)(B) are mutually exclusive.)

To establish that a claim is non-dischargeable under section
523(a)(2)(A) the creditor must prove the following by a
preponderance of the evidence: (1) the debtor made a false
representation; (2) the debtor made the representation with the
intent to deceive the creditor; (3) the creditor relied on the
representation; (4) the creditor's reliance was reasonable[1]; and
(5) the debtor's representation caused the creditor to sustain a
loss.  <u>Fowler Bros. v. Young (In re Young)</u>, 91 F.3d 1367, 1373
(10th Cir. 1996).

To establish that a claim is non-dischargeable under section
523(a)(2)(B) the creditor must prove the following by a

_____

[1]The United States Supreme Court ruled that for section
523(a)(2)(A) the reliance must only be "justifiable."  <u>Field</u>, 516
U.S. at 74-75.

preponderance of the evidence: (1) the debtor made a statement in writing; (2) the statement concerned the debtor's or an insider's financial condition[2]; (3) the statement was materially false; (4) the creditor actually and reasonably relied on this false statement; and (5) the debtor made the false statement with the intent to deceive the creditor. <u>Kosinski</u>, 424 B.R. at 608.

**FACTS**

**FACTS ADMITTED IN ANSWER**[3]

1. Plaintiff is a New Mexico Limited Liability Company with its primary place of business being located in Bernalillo County, New Mexico. (Admitted in Defendant's Answer, paragraph 1).

2. Defendant Troy M. Baillio is a resident of Bernalillo County, New Mexico. (Admitted in Defendant's Answer, paragraph 1).

3. JTS/Simms, LLC, Debtor in Case No. 07-07-12153 SA, is a New Mexico Limited Liability Company ("JTS Simms") with its primary place of business being located in Bernalillo County, New Mexico. New Mexico. (Admitted in Defendant's Answer, paragraph 1).

---

[2]The Tenth Circuit construes the phrase "financial condition" strictly and limits it to only those statements that present an overall picture of the debtor's financial condition, purports to state the debtor's overall net worth, overall financial health, or overall ability to generate income, or a statement that provides an equation of assets and liabilities. <u>Lazaron v. Lucas (In re Lucas)</u>, 386 B.R. 332, 336 (Bankr. D. N.M. 2008)(citing <u>In re Joelson</u>, 427 F.3d 700 (10th Cir. 2005), <u>cert. denied</u>, 547 U.S. 1163 (2006)).

[3] For the sake of completeness and continuity, the Court has also included certain findings in this part of the memorandum opinion based on the testimony of Mr. Douglas McKinnon.

Case 08-01124-s    Doc 22    Filed 09/21/10    Entered 09/21/10 14:08:02 Page 5 of 53

4.  JTS Properties and Investments, LLC is a New Mexico Limited Liability Company ( "JTS Properties") with its primary place of business being located in Bernalillo County, New Mexico. New Mexico.  (Admitted in Defendant's Answer, paragraph 1).

5.  The Court has jurisdiction over the subject matter herein and the parties to this action. This action is a core proceeding under 28 U.S.C. §1334 and 28 U.S.C. §157(b)(2)(I).  Venue is proper in this Court.  (Admitted in Defendant's Answer, paragraph 1).

6.  JTS Simms owned the real Property located at 400 Gold S.W. in Albuquerque, NM, commonly known as the Simms Building ( the "Simms Building" or the "Property").  (Admitted in Defendant's Answer, paragraph 1).

7.  JTS Simms financed the purchase of the Simms Building by entering into short-term bridge financing with Silar Special Opportunities Fund, L.P. ("Silar").  (Admitted in Defendant's Answer, paragraph 1).

8.  Troy Baillio was the Managing Member of JTS Simms.  In June of 2007, Troy Baillio and JTS Simms were in need of a significant loan or infusion of cash in order to make payment on the obligation to Silar.  At some point, Troy Baillio came into contact with, among others, Art Silva ("Silva"), in an attempt to locate lenders.  (Admitted in Defendant's Answer, paragraph 2,

except that Art Silva found Defendant rather than Defendant contacting Art Silva).

9.  Plaintiff and Defendant Baillio agreed the Plaintiff would loan Defendant Baillio or "the Simms Building" $250,000.00 for 30 days, at which time Defendants would repay the loan plus $75,000.00 for a total payment of $325,000.00.  (Admitted in Defendant's Answer, paragraph 4).

10.  On Saturday morning, June 23rd 2007, Timothy D. Steider, Douglas H. McKinnon and G. Luke McKinnon, who are the three members of the Plaintiff LLC, met with Defendant Baillio at Plaintiff's office.  (Admitted in Defendant's Answer, paragraph 7).

11.  Troy M. Baillio, as President of JTS Properties and Investments, LLC, signed the Promissory Note dated June 23, 2007 (the "Note" or "Promissory Note"), a true and correct copy of which was attached as Exhibit 1 to the complaint.  (Admitted in Defendant's Answer, paragraph 10).

12.  Troy M. Baillio, as Member of JTS/Simms, LLC and G. Luke McKinnon, as Member of Phoenix Equity Ventures, LLC, signed the Agreement dated June 23, 2007 (the "Agreement"), a true and correct copy of which was attached as Exhibit 2 to the complaint. (Admitted in Defendant's Answer, paragraph 10).

13.  Troy M. Baillio, as member of JTS/Simms, LLC, a New Mexico Limited Liability Company, signed the Warranty Deed dated June

23, 2007 (the "Warranty Deed"), a true and correct copy of which was attached as Exhibit 3 to the complaint. (Admitted in Defendant's Answer, paragraph 10).

14. Troy M. Baillio, as Member/President of JTS Properties and Investments, LLC, and Douglas H. McKinnon, as Member of Phoenix Equity Ventures, LLC signed the Extension Agreement dated July 23, 2007 (the "Extension Agreement"), a true and correct copy of which was attached as Exhibit 4 to the First Amended Complaint. (Admitted in Defendant's Answer, paragraph 10).

15. Pursuant to the Agreement, the Warranty Deed was placed in escrow at Sunwest Trust, Inc. (Admitted in Defendant's Answer, paragraph 11) (remainder of paragraph denied).

16. On June 23, 2007, pursuant to the terms of the Promissory Note, the Agreement and the Warranty Deed, Plaintiff Phoenix Equity Ventures, LLC delivered to Troy Baillio a check in the amount of $100,000, made payable to "**U.S. Title** **FOR JTS,/Simms, LLC**." (Admitted in Defendant's Answer, paragraph 12).

17. On June 29, 2007, Plaintiff delivered a check for $150,000.00 made out to JTS Simms. (Testimony of Douglas McKinnon.)

18. At approximately, 5:13 PM on July 23, 2007, Plaintiff sent a proposed Extension Agreement (Plaintiff's Trial Exhibit 4), to Defendant, via facsimile. (Admitted in Defendant's Answer,

Case 08-01124-s    Doc 22    Filed 09/21/10    Entered 09/21/10 14:08:02 Page 8 of 53

paragraph 21). The Extension Agreement sought to extend the
deadline for repayment by an additional 46 (forty six) hours.

19. In return for the approval of the additional 46 hours,
Plaintiff demanded an additional $30,000.00 to be repaid, which
Defendant agreed to. (Testimony of Douglas McKinnon.)

20. Neither Troy Baillio, JTS Properties and Investments, LLC,
nor anyone on their behalf, have ever repaid any of the
$250,000.00 received from Phoenix Equity Ventures, LLC, and the
entire amount owed pursuant to the Promissory Note, the Agreement
and the Extension Agreement [a total of $355,000.00] remains due
and payable. (Admitted in Defendant's Answer, paragraph 28).

21. At the time of the execution of the Promissory Note,
Agreement, and Warranty Deed, Defendant Baillio knew that the JTS
Simms' Articles of Organization prohibited JTS Simms from
incurring debt other than ordinary trade payables without
unanimous consent of the members, including the Independent
Member. (Admitted in Defendant's Answer, paragraph 30).

22. At the time of the execution of the Promissory Note (Exhibit
1), Agreement (Exhibit 2) and Warranty Deed (Exhibit 3), Troy
Baillio knew that the Mortgage held by Silar Special
Opportunities on the Simms Building prohibited JTS Simms from
placing a lien on, or transferring any interest in, the Simms
Building, without the written approval of Silar Special
Opportunities. (Admitted in Defendant's Answer, paragraph 30).

Page -9-

23.  At the time of the execution of the Note, Warranty Deed and Agreement, Defendant Baillio had no way to repay the $325,000.00 to Plaintiff other than by refinancing the bridge loan with Silar, or borrowing money from some other source.  (Admitted in Defendant's Answer, paragraph 32).

24.  The needed refinance or borrowing was not approved and never occurred.  (Admitted in Defendant's Answer, paragraph 34; remainder of paragraph denied).

25.  Troy Baillio and JTS Properties are also alleged to be liable to other parties for obligations, which obligations resulted in lawsuits against Troy Baillio and JTS Properties.  (Admitted in Defendant's Answer, paragraph 36; remainder of paragraph denied).

**FACTS DETERMINED AT TRIAL**

During Plaintiff's case, Plaintiff put on the testimony of four witnesses over two days.  The Court observed the demeanor of the witnesses and resolved to its satisfaction certain discrepancies between different versions of events.

**A.    Witness one.**

The first witness, Douglas McKinnon testified as follows: He is a member of the Plaintiff.  He is a consultant for an independent trust company.  He received his B.A. in business from Baylor University and has been an entrepreneur for 20 years, after working in a trust department for 10 years.  He has

Page  -10-

purchased real estate in the past and dealt with real estate
contracts and mortgages.

Plaintiff, an LLC, was formed by three individuals who each
hold a one-third interest: Mr. KcKinnon and his son Luke McKinnon
and a friend Timothy Steider (the "members").  Mr. McKinnon first
heard of Defendant and the Simms Building through a call from Mr.
Steider, who in turn had been contacted by Art Silva, a loan
broker that advised he had a client seeking short term funds to
get from interim financing to permanent.  Mr. Steider had
previously told Mr. Silva that Plaintiff was interested in
certain types of lucrative deals.

During the evening of June 22, 2007, the members met and
looked at a synopsis of Defendant's finances that Mr. Silva had
prepared.  On the morning of June 23, 2007, the members met with
Mr. Silva briefly, who gave them more documents from Defendant.
Mr. Silva left and the members reviewed them, including a
personal financial statement (exhibit 7), a financial statement
of JTS Properties (not in evidence), and an appraisal of and a
cash flow projection for the building.

Later in the morning, the members were joined by Defendant,
who told them that he needed $250,000 for two weeks until his
permanent financing came through.  Defendant told the members
that he was willing to pay their price.  Plaintiff required that

the Defendant and his LLC's ("the entities") would need to put up a one-half interest in the Simms Building as collateral.

The members then questioned Defendant on his personal financial statement, which valued his net worth at $7.9 million. Mr. McKinnon testified that he asked if the statement was valid, and Defendant stated that it was valid as of April 30, 2007. He told them he also owned property in New Mexico and Massachusetts. He valued his interest in all the real estate at $6.0 million.

Defendant told the members that JTS Simms purchased the Simms Building and JTS Properties owned most of JTS Simms.

Mr. McKinnon testified that it was important for the members to know that Defendant was a successful business person; and that without a substantial personal financial statement Plaintiff would not have made the loan.

The members also reviewed the rent rolls for the Simms Building with Defendant and the building appraisal. The members wanted to determine if the cash flow made the collateral profitable. The members determined that the cash flow was not sufficient to make interim financing payments, but they believed that Defendant had a confirmation letter for permanent financing[4]. Mr. McKinnon did not recall reviewing any other documents regarding the LLCs or Silar.

_____

[4]There was no evidence presented that he did not have such a letter.

Mr. McKinnon described the overall deal as follows: Defendant stated that he needed $250,000 for Silar and tenant improvements and for that $250,000 he would sign a note for $325,000 due in 30 days; in exchange, Plaintiff would loan JTS Properties $250,000 and as security for payment the entities would execute a special warranty deed for a 50% interest in the Simms Building to be kept in escrow in the event of default.

Mr. McKinnon specifically stated that there was a discussion about Defendant's ability to deliver a deed. Defendant stated that he had the authority as a majority member to execute a deed. Defendant stated that his wife was another member and that there was also a 1% owner. Defendant stated that the deed would need to state that JTS Simms was the grantor. Exhibit 3 is a copy of a June 23, 2007 warranty deed in which JTS Simms granted a 50% interest in the Simms Building to Phoenix Equity Ventures.

Exhibit 1 is a copy of a June 23, 2007 promissory note in which JTS Properties and Investments, LLC promises to pay to Phoenix Equity Ventures $325,000 in one payment on or before July 23, 20007 [sic]. The Promissory Note was signed by Troy M. Baillio, "President", JTS Properties and Investments, LLC.

Exhibit 2 is a copy of an Agreement between Plaintiff and JTS Simms dated June 23, 2007 but "[e]xecuted on June 25, 2007". Recital 1 states the parties' intent to make a short term loan regarding the Simms Building. Recital 2 states:

The parties acknowledge that this transaction is being
consummated in a very short period of time, and that
there has been very little time to allow borrower [sic]
to perform due diligence by performing a review of
documents and inspection of the property.  Accordingly,
the parties acknowledge that the return of, and on, the
lender's investment is high due to the risk factors
considered by the parties – specifically, real estate
market and financial market considerations.  The risk
factor for potential misrepresentation or fraud was not
considered risk factor in this transaction, and any
successful action brought by lender for losses for
reasons other than real estate market or financial
market causes shall entitle lender to an award of
attorney's frees and costs along with consequential and
punitive damages, as the court may deem reasonable.

Terms and Conditions 1 and 2 state that Plaintiff will provide

the $250,000 as follows: a $100,000 check upon execution of the

documents, and a $250,000 check on or before Friday, June 29,

2007 at 4:00 P.M.  Terms and Conditions 3 states that JTS Simms

(not JTS Properties) will execute a promissory note for $325,000

payable 30 days after execution of the documents.  Terms and

Conditions 4 states that JTS Simms will execute a warranty deed

for an undivided one half ownership in the Simms Building, to be

held in escrow until the agreement is fully completed.  Terms and

Conditions 5 and 6 provide for release of the deed in case of

performance or default.  Terms and Conditions 7 states that JTS

Simms will not cause any liens to be recorded subsequent to the

agreement.  Terms and Conditions 8 anticipates that the parties

will become joint owners of the Simms Building and will share

equally all equities, liabilities and decisions normally

associated with joint ownership of property of this type.  Terms

and Conditions 9 states that both parties have entered the
agreement voluntarily without coersion [sic], force or threats
and acknowledge that they have had adequate opportunity to have
legal counsel review the Agreement.  Terms and Conditions 10
acknowledges that Timothy Steider is a licensed real estate
broker and a licenses [sic] attorney in the State of New Mexico
and has in no way represented or provided counsel to either party
and that he is participating in this transaction as a member of
Plaintiff for his own personal profit.  Terms and Conditions 16
provides that "this lease" [sic] is governed by and construed in
accordance with New Mexico law.  Terms and Conditions 17 provides
that "this lease" [sic] shall not be altered, changed, or amended
except by written instrument executed by the parties.  Terms and
Conditions 18 states: "This document contains the entire
understanding between the parties, and any prior oral or written
agreements are incorporated in this agreement and any prior oral
or written agreements are hereinafter excluded from this
agreement."  (the "integration clause[5].")   The Agreement was

_____

     [5]Black's Law Dictionary (8th ed. 2004) defines "integration"
as:
     Contracts.  The full expression of the parties'
     agreement, so that all earlier agreements are
     superseded, the effect being that neither party may
     later contradict or add to the contractual terms. —
     Also termed merger.

It also defines "integration clause" as:
     A contractual provision stating that the contract
                                        (continued...)

Page -15-

signed by JTS Simms, by Troy Baillio, its Member and Phoenix Equity Ventures, LLC by G. Luke McKinnon, Member.

Mr. McKinnon specifically testified that the Agreement outlined the total agreement that Plaintiff had with the entities.

When questioned regarding Plaintiff's due diligence, Mr. McKinnon stated that doing any was difficult due to the urgency of the situation. He believed that Silar was going to "drop the hammer" on Monday, so the situation was urgent. He stated "we relied on [Defendant's] representations as little as we could." He also stated that after the $100,000 was lent, the members visited the building and went to the courthouse to verify the ownership of the building.

When questioned what Plaintiff specifically relied on in making the loan, Mr. McKinnon stated that it relied on: 1) the appraisal of $12 to $13 million[6], 2) the purchase price for the

---

[5](...continued)
represents the parties' complete and final agreement and supersedes all informal understandings and oral agreements relating to the subject matter of the contract. — Also termed merger clause; entire-agreement clause.

[6]Regarding the appraisal, Mr. McKinnon saw two, one for $12.8 million and one for $13 million. Plaintiff contacted the appraiser after the bankruptcy filing, who allegedly stated that the property was worth only $11 million. The appraiser did not appear as a witness, however. Mr. McKinnon claims that the appraisals were altered. Mr. McKinnon also specifically
(continued...)

Page -16-

building at $7 million[7], 3) Defendant's personal financial statement[8], and 4) the members' expertise[9] in looking at real estate transactions and the accuracy of the items provided[10].

Mr. McKinnon stated that this $250,000 transaction was the largest deal that Plaintiff had entered.

When asked if Plaintiff had considered what would happen if Silar started to foreclose, Mr. McKinnon testified that the money being lent was to prevent foreclosure. In other words, no.

The next contact Plaintiff had with Defendant was either one day before or the due date of the loan, in a phone call from Defendant's attorney. The message was that the Internal Revenue Service had filed a lien and that Defendant had the money but could not pay it, and he was requesting an extension. Mr.

---

[6](...continued)
testified that he was not accusing Defendant of altering the appraisal. He just opined that someone did. Plaintiff's only evidence that the appraisal was not accurate is hearsay. And, Plaintiff presented no evidence that Debtor altered anything. The Court is unable to find that this was an intentional misrepresentation.

[7]There was no evidence presented at trial that this was a misrepresentation.

[8]The personal financial statement was probably materially false. This will be discussed below.

[9]The member's expertise is not a representation by Defendant.

[10]Other than the Defendant's personal financial statement, Plaintiff has not proved anything else was inaccurate.

Page -17-

McKinnon stated that Plaintiff offered a 46 hour extension in exchange for an additional $30,000. Defendant agreed.

Mr. McKinnon then testified that Defendant's attorney wrote a letter to the escrow agent denying that there was a default and demanding that the deed not be released. As of the trial date neither the loan nor the extension fee were paid.

On cross examination, Mr. McKinnon testified that Plaintiff was formed in November, 2006 and had entered into five or six previous transactions. All were single family residence bailouts. He testified that all three members have years of real estate experience. The experience is not in making real estate loans, however. None of the members were ever in the "loan business." Rather, they would advance money in exchange for an ownership interest in real estate[11]. That was why the "security" Plaintiff had on the Simms Building was a promissory note and a warranty deed.

Mr. McKinnon stated that in the past he had guaranteed a loan. He understood that a lender could require a guarantee in order "to get paid." Plaintiff did not have Defendant guarantee

---

[11]On cross examination, Mr. McKinnon testified that all of Plaintiff's projects were "hard money deals." He described those as problem cases where no alternative financing was available. Plaintiff's procedures did not call for a loan application. When asked how the loans were documented, or records made of them, he stated that he did not understand the question. The Court concludes that Plaintiff did not have established policies and procedures in place and dealt with loans on a case by case basis.

the loan in this case.  When asked why there was no personal guarantee, Mr. McKinnon stated that nobody had suggested a personal guarantee because "we had one-half of the building."  At trial, however, in retrospect he believed that Plaintiff should have had Defendant sign one.

Mr. McKinnon knew what a "special purpose entity" was, but had not heard the term "bankruptcy remote entity."  He was unaware that the JTS Simms LLC documents established an independent member[12].

The Plaintiff did not see the Silar mortgage before executing the loan documents because there was "no time." Plaintiff did not ask to see the mortgage at the meeting because "[Defendant] was in a hurry."

When questioned what exactly Defendant misrepresented, Mr. McKinnon stated that there were three and only three items: 1) Defendant's failure to disclose the contract restrictions about transfers of the Sims Building, 2) the personal financial statement, and 3) the appraisal.

The personal financial statement shows $312,000 in cash. When asked why Defendant did not simply pay his own money to Silar, Mr. McKinnon stated that Plaintiff knew that the money was

---

[12]He earlier testified that Defendant told him has wife also had an interest and that there was a 1% owner.  There was no evidence that any member questioned why there would be a 1% owner, or who it was, or what the function of such an owner would be.

gone because it was used for a down payment on the Simms
Building.  When asked how Plaintiff could then believe that the
financial statement was still accurate, he responded that the
$312,000 was immaterial.

When asked how Plaintiff would collect on its loan, Mr.
McKinnon responded "the deed."  When asked what Plaintiff would
do if the Silar permanent financing fell through, he responded
"the deed."  However, he also stated that Defendant had verbally
guaranteed that he expected permanent financing within two weeks,
and that Art Silva had confirmed that.

Mr. McKinnon admitted that Defendant told Plaintiff that JTS
Simms was a special purpose entity.  He knew what a "due on sale"
clause was, and he assumed that there was one in the Silar
mortgage.  He thought Silar would have called the loan if it knew
that Plaintiff had acquired a one-half interest in the building.

On redirect Mr. McKinnon again summarized his understanding
of the deal: We [_i.e._, Plaintiff] agreed to loan whoever needed
the money, $250,000, and we'd receive either $325,000 or one-half
the building in two weeks.  The security was critical.  "One-half
of a building worth $2 or $3 million was key to making it work."

**B.    Witness two.**

Defendant testified second as an adverse witness for
Plaintiff.  At the time of trial he was unemployed, but in 2007
he was buying and selling real estate.  At one time he testified

that he owned 97% of JTS Simms and a "Special Member" owned the other 3%. At another time he stated that JTS Properties owned 97% of JTS Simms. He and his wife each own 50% of JTS Properties. Defendant testified that he did not understand the difference between personal assets and corporate assets, or personal liabilities and corporate liabilities, or the significance of this lack of knowledge. Later in his testimony Defendant purported not to understand the difference between a mortgage and a deed, or between real estate and an entity that owns the real estate. Despite having a career that involved purchase and sale of real estate, Defendant claims he has never received a deed because he never owned any property outright – he always signed a mortgage. He admitted he could be wrong on this point, but believed he only applied for loans, signed loan documents at the title companies, and sometimes would sign a guarantee or HUD forms. When later questioned whether Simms Building, Inc. (The prior owner from whom JTS Simms purchased the Simms Building) filed a lawsuit against him on a promissory note he responded "I don't know. I didn't show up. I should have only owed $530,000. I don't even read complaints, I can't deal with it, I throw them in the trash." The Court was surprised about the extent of Defendant's claimed lack of knowledge, and finds the witness less than honest and credible. The Court also

finds that in 2007, Defendant was in business matters quite above his head.

In late 2006 or early 2007, Defendant paid a non-refundable $350,000 for an option to purchase the Simms Building. He sought financing from several people[13]. He finally obtained interim financing with Silar Special Opportunities Fund. He understood that the Silar loan would be for a sixty-day term and then roll over into a twelve-month loan; and, if it failed to rollover there would be a $405,000 prepayment penalty. That, however, was not Silar's understanding and the issue was litigated in the JTS Simms bankruptcy case. Eventually Silar obtained stay relief and foreclosed on the property.

Defendant met Plaintiff during his attempt to payoff the Silar loan. He went to Art Silva, a loan broker, seeking a "hard money loan," which he described as an alternative to mainstream financing. Hard money loans are difficult to find and come with a high interest rate due to perceived risk. Defendant stated that Mr. Silva put him in contact with Mr. Steider about ten days before the loan closed, and that during that ten days he and Mr. Steider exchanged e-mails about the deal.

Defendant's recollection of the June 23, 2007 meeting is drastically different from Mr. McKinnon's. Defendant testified

---

[13]The inference is that he lacked permanent financing when he paid $350,000 for the option.

that they did not review his personal financial statement at the meeting, nor the JTS Simms financial statement, nor the rent rolls.  Defendant knew that Plaintiff had those documents, but they did not discuss them.  The sole topic of discussion was the documents that were being executed as they met.  Defendant stated that he never discussed his personal finances with Plaintiff until after default, probably in August, 2007.  At that time he was attempting to repay the debt and gave a list of assets and debts and told what the LLC's owned.  Debtor also testified that when he prepared his personal financial statement in April, 2007, it was generally accurate, "but missed something[14]."

Defendant also testified that he knew that any conveyance of the Simms Building real estate had to be approved, but he was unsure whether it had to be approved by Silar or by the Special Member.  His attorney informed him that there was no prohibition on transferring units of JTS Simms as collateral.  Therefore, his intent was to pledge units of JTS Simms as collateral for Plaintiff's loan.  Defendant further testified that he informed Plaintiff of this restriction and the necessity of structuring the deal to conform to this restriction.  Defendant testified that he told Plaintiff the only way he could do the loan was by pledging "shares."

---

[14]This "something" was not pursued at trial.

Page -23-

Defendant's testimony is supported by Exhibit F.  Exhibit F is an e-mail from Defendant to Mr. Steider dated June 20, 2007, that enclosed the prior owner's profit and loss statement for 2006[15] and two "security instruments."  The security instruments were a draft promissory note from JTS Properties and a draft "JTS Simms Unit Transfer Agreement" ("Transfer Agreement").  The draft Transfer Agreement is actually an agreement between JTS Properties and an unspecified lender.  It provides that, upon default of the loan, JTS Properties will transfer an unspecified number (to be determined) of units of "Simms[16]" to the lender in full satisfaction for the note.  Section 2, Risk Factors, states that **"These securities are highly speculative in nature, and Lenders in this offering face a substantial risk that they will lose all or part of their investments, or that their investments will generate an inadequate return."**  It further states that Simms has no operating history and the membership units have restrictions on transfer and there may never be a market for them.

---

[15]This profit and loss statement is not accompanied by a balance sheet, or notes to describe the accounting method or any assumptions.  It does not make any disclosures, and is not signed by anyone.  The Defendant also did not disclose the source of this document in the e-mail or at trial.

[16]The term "Simms" is not defined in the document, but presumably is JTS Simms.

Defendant testified that when he showed up on the morning to execute documents, Plaintiff had different documents from those in the e-mail. Defendant questioned what documents he was signing, and claims that the members told him they were "the same thing." He further testified that when he signed the warranty deed (exhibit 3) the members told him he was only transferring a one-half interest in the LLC[17]. When asked whether the deed transferred real estate rather than an LLC, he responded "That was not how it was explained to me." He stated that he only discovered that he had signed a deed about a month later when Plaintiff attempted to remove it from escrow in order to record it.

C.   **Witness three**.

The third witness was Art Silva, a mortgage broker who finds loans for residential and commercial properties. Defendant informed Mr. Silva that he needed a short term loan and a refinance of a property that already had a mortgage. He then came to Mr. Silva's office with papers: personal and corporate financial statements, profit and loss statements, tax returns, appraisals, a game plan, pro formas, and rent rolls. Mr. Silva specifically recalled receiving both the personal and JTS Properties financial statements, and recalled giving both to the potential lenders. Mr. Silva also gave Defendant Mr. Steider's

---

[17]He never clarified which LLC.

name as a potential lender and gave a copy of the packet[18] of documents to Mr. Steider.  When Mr. Silva had no further contact with Defendant ninety days to six months later, he shredded his file.

**D.    <u>Witness four</u>.**

The fourth witness was Timothy Steider, an attorney and member of Plaintiff.  Mr. Steider was a real estate broker before law school and now practices real estate law in Albuquerque.  He testified that Plaintiff was organized to invest in properties. Mr. Silva introduced Defendant to Plaintiff and gave Mr. Steider a loan packet.  The members reviewed the packet and decided it was worth looking into.  The terms were not good enough, however, because Defendant was offering to pledge shares in an LLC.  Mr. Steider claimed that Plaintiff was simply not interested in shares.  He also recalled receiving an e-mail with a share purchase agreement.

Mr. Steider did not recall receiving the e-mail in Exhibit F that contained the unit transfer agreement.  He did recall seeing the document at the June 23 meeting.  He testified "We told [Defendant] at the meeting we were not interested.  We decided that if we could get an interest in the Simms Building it would be worth it."

---

[18]The "packet" itself, as a whole, does not appear in evidence.  Nor do any tax returns, pro formas, game plans, or LLC financial statements.

When asked what was his understanding of the deal, he stated that it was "the Simms Building as collateral to guarantee a loan." He stated that the Plaintiff wanted "a real estate secured investment." When asked why Plaintiff was not interested in shares, he responded "we didn't know him or his company." He then testified that Defendant finally agreed to give a deed in escrow.

Mr. Steider next testified that there were specific discussions of Defendant's authority to execute a deed and that Defendant told them he could. Mr. Steider then testified that if Plaintiff had known that he was prohibited from signing a deed there would have been no loan.

Mr. Steider testified that Defendant's personal financial statement had a large impact on the decision to lend. Although the financial statement showed $6.0 million out of a total $7.9 million net worth was in JTS Properties, he testified that the members did not single that asset out to look at or verify. The statement was obviously not professionally prepared and it fails to list any assumptions, notes, or disclosures.[19] Mr. Steider testified that it looked more like a summary of a financial

---

[19]For example, the tax basis of assets is omitted and there is no deferred tax calculation if the assets were to be sold. Since most of the assets are depreciable real estate or LLC's heavily invested in depreciable real estate, this could be a significant number. "Accounting for deferred tax liability is in accordance with generally accepted accounting principles." U.S. v. Hillard, 31 F.3d 1509, 1511-12 (10th Cir. 1994).

statement as opposed to an actual financial statement because of its lack of detail.

When asked why Defendant needed cash, Mr. Steider stated that Defendant claimed he needed it to stay current until a refinance of the property came through, that he had a lot of commitments but was cash poor, but he knew money was coming. He further testified that that seemed "viable" to the members, and that they "understood."

Mr. Steider prepared the subject documents. When questioned why the wrong LLC appeared as the borrower on the promissory note, he testified that it didn't matter, the members believed they were all one and the same thing. He also testified that the deed was what the agreement required.

Mr. Steider testified that the members were satisfied with the package from the mortgage broker and assumed that Mr. Silva had done due diligence. He also testified that he saw an appraisal of the building at $12.8 million with approximately $6.5 owed on a mortgage, so believed that there was a large equity. He claimed that the Plaintiff offered to outright purchase one-half of the property for $250,000 instead of loaning the money, but Defendant refused.

When asked specifically what he relied on in deciding to approve the loan, he responded that he relied on 1) the

documents[20], 2) the equity in the Simms Building, 3) "heavily" on

the profit and loss statement[21], 4) Defendant's representations

that the deal was "solid[22]", 5) Defendant's representation that he

_____

[20]The questioning did not follow up on exactly which
documents he relied.  Earlier he testified that he relied on the
personal financial statement.  The actual loan documents would
not have been drawn up before a decision was made to make the
loan, so it could not have been those documents.  It must have
been the documents in the loan packet, only some of which are in
evidence.  Plaintiff did establish a question regarding an
appraisal that was possibly altered, but specifically did not
accuse Defendant of that act.  And, Plaintiff has not pointed to
anything else in the loan packet that was materially false.

[21]The profit and loss statement was that of Simms Building,
Inc., the prior owner of the building.

[22]Defendant's representation that the deal was "solid" was
an opinion.  Opinions are not false representations of existing
or prior facts.  <u>Hodgin v. Conlin (In re Conlin)</u>, 294 B.R. 88,
100 (Bankr. D. Minn. 2003)(A debtor's representation that a
transaction is safe or makes good financial sense is only an
opinion, not a representation of fact actionable under section
523(a)(2)(A).)  "Solid" in this context is a relative term.
Solid compared to what?  Solid based on what factors?  <u>See</u>
Restatement (Second) of Torts § 538A.  "A representation is one
of opinion if it expresses only (a) the belief of the maker,
without certainty, as to the existence of a fact; or (b) his
judgment as to quality, value, authenticity, or other matters of
judgment."  <u>Id.</u> cmt. b expands:
> One common form of opinion is a statement of the
> maker's judgment as to quality, value, authenticity or
> similar matters as to which opinions may be expected to
> differ.  Thus the statement that an automobile is a
> good car is a relative matter, depending entirely upon
> the standard set as to what is a good automobile and
> what is not, and it is a matter upon which individual
> judgments may be expected to differ.  The maker of a
> statement of this nature will normally be understood as
> expressing only his own judgment and not as asserting
> anything concerning horsepower, riding qualities or any
> of the dozen other factors that would influence his
> judgment.

Page -29-

had a lot of real estate experience[23], 6) Defendant's honest appearance[24], and 7) Mr. Silva's representation that the refinance would occur in two weeks[25]. He reiterated that if he had known of the transfer restrictions he would not have agreed to the loan.

On cross examination, Mr. Steider testified that the members looked at the loan packet for an "hour or two." He also testified that they wanted a secured debt, not a debt guaranteed by Defendant. To ensure payment, they secured the loan with the Simms Building.

He further testified that no member reviewed the Silar mortgage before the loan closed. When asked if that were "uncautious" he responded that Mr. Silva had given them his due diligence and told them it was a refinancing in two weeks. When

---

[23]Defendant did have a lot of real estate experience. The testimony indicated that he had bought and sold over 50 houses. This representation appears true. If anything, generalized statements such as this appear to be mere puffing rather than a misrepresentation. See, e.g., Alvine v. Keller (In re Keller), 72 B.R. 599, 602 (Bankr. M.D. Fla. 1987)(An alleged representation by defendants that their corporation enjoyed an excellent reputation in the community was merely puffing and not fraudulent.)(Decided pre-Field on clear and convincing evidence grounds, but that is not material to the point being cited.); see also Rezin v. Barr (In re Barr), 194 B.R. 1009, 1018 (Bankr. N.D. Ill. 1996)(Marketing hyperbole is mere puffing.)

[24]An honest appearance is not a statement by the Debtor and cannot be the basis for holding a debt nondischargeable.

[25]The Court thinks that it takes a bit of a stretch to consider Mr. Silva as Defendant's "agent." However, even assuming he were and therefore his statements were attributable to Defendant, there was no proof that the statements regarding the expectation of the imminent refinance were untrue.

Case 08-01124-s   Doc 22   Filed 09/21/10   Entered 09/21/10 14:08:02 Page 30 of 53

asked if the Silar mortgage was in the loan packet, he answered "probably was – probably some title work."  No member had reviewed the mortgage because there was no time.

When questioned why Plaintiff did not require a personal guarantee after seeing the personal financial statement, Mr. Steider responded that the members "didn't know [Defendant] but we knew the Simms Building and were willing to take that."

**<u>DEFENDANT'S MOTION TO DISMISS</u>**

At the close of Plaintiff's case, Defendant moved to dismiss.  After reviewing the testimony presented by Plaintiff and the arguments of the parties, and considering the relevant authorities, the Court finds that the Defendant's Motion is well taken and should be granted.

First, as to both dischargeability claims, Defendant argues that the loan document contains an integration clause that precludes the Plaintiff from arguing it relied on anything extrinsic to the explicit statement in the document.

Next, Defendant makes several arguments specific to the "tort" claim (the section 523(a)(2)(A) claim).  First, Defendant argues that there was no misrepresentation: Plaintiff bargained for either $75,000 in interest in 30 days <u>or</u> an escrowed deed to one-half of the Simms Building.  Defendant asserts he complied by

executing and escrowing a deed[26], so there was no
misrepresentation.  Furthermore, Plaintiff in fact received
exactly that for which it bargained.  To the extent Defendant
argued that Plaintiff suggested that statements regarding the
refinance of the Simms Building were untrue, Plaintiff
specifically admitted 1) that it was not arguing that the
promises to pay were misrepresentations and 2) that Defendant
really thought that the refinance would go through.

Second, Defendant argues that Plaintiff did not prove
justifiable reliance on anything Defendant did, said or omitted.
Rather, he claims Plaintiff relied on Mr. Silva, the upcoming

_____

[26]Plaintiff also argues that Defendant misrepresented the
facts by failing to disclose that some contract with Silar (not
in evidence) prohibited anyone from executing a deed or granting
a junior lien on the Simms Building.  The Court does not find
this relevant.  The fact that Defendant or one of his LLC's
breached a contract with Silar does not impact on the validity of
the deed that in fact was delivered to Plaintiff.  See Kokoricha
v. Estate of Keiner, 236 P.3d 41, 47, 2010 WL 2793780 at *6,
2010-NMCA-053 at ¶ 26 (N.M. App. 2010)(Despite proof of fraud, a
voidable deed passes good title to a bona fide purchaser.)(Citing
State ex rel State Tax Commission v. Garcia, 77 N.M. 703, 709,
427 P.2d 230, 234-35 (1967)).  See also Security Federal Savings
& Loan Ass'n of Albuquerque v. Commercial Investments, Ltd. (In
re Commercial Investments, Ltd.), 99 B.R. 455, 459 (Bankr. D.
N.M. 1989)(Under New Mexico law, a bona fide purchaser for value
takes free of defects that are unknown to the purchaser and not
discoverable in the exercise of ordinary care.)  Mr. Steider
further testified that despite certain omissions in the deed, it
was valid as written and sufficiently acknowledged to record.
     Plaintiff also raises certain obstructions that Defendant
and his attorney created to hinder Plaintiff from removing the
deed from escrow after default.  These actions are not related to
nor probative of fraud in the inception of the loan or the false
financial statement.

refinance of the Simms Building and the escrowed deed to a multi-million dollar property.  Third, Defendant argues that any representations were unrelated to the actual loss, which was caused by the failure to refinance.

Finally, Defendant also makes several specific arguments regarding the false financial statement claim.  First, Defendant argues that Plaintiff did not actually rely on the financial statement.  The borrower was JTS Properties.  Defendant urges that, if Plaintiff were truly relying on Defendant's personal financial statement as a source of funds for repayment, it would have insisted on a personal guarantee by Defendant.  Plaintiff did not obtain a personal guarantee.

Second, Defendant argues that the financial statement is not one that a professional real estate investor would reasonably rely on.  Third, Defendant argues that the fact that the loan was a "hard money loan" in itself proves Plaintiff was relying on the collateral more than any financial statement as a source of repayment.  Fourth, Defendant argues that the financial statement was unrelated to the loss; the loss was caused by the failure to refinance, which was exactly the risk Plaintiff assumed.

**PLAINTIFF'S RESPONSE**

Plaintiff responds that its reliance need only be justifiable, and that in this case it was.  Plaintiff consists of three individuals unsophisticated in large real estate

Page -33-

transactions.  Silva was Defendant's agent and approached them
with a materially false financial package that induced their
reliance and subsequent loss.  Defendant's omission of facts
relevant to transfer of ownership in the Simms Building was
fraudulent, and Plaintiff would never have loaned the money had
it known of the restrictions.  It is true that the loan was a
"hard money" loan, but that further justifies Plaintiff's
reliance because of the "back-up security."

**DISCUSSION**

To make out a prima facie case under a section 523(a)(2)(A)
or 523(a)(2)(B) cause of action, the lender must prove each
element of the appropriate cause of action by a preponderance of
the evidence.  <u>Grogan v. Garner</u>, 498 U.S. 279, 286 (1991).  Thus,
the Court must grant the Debtor's motion for judgment on partial
findings with respect to either of Plaintiff's objections to
discharge of debt if it failed to prove any element of the
appropriate objection by a preponderance of the evidence.
<u>Palmacci v. Umpierrez (In re Umpierrez)</u>, 121 F.3d 781, 787 (1st
Cir. 1997).

**A.    The Integrated Contract Argument**

Defendant argues that the integration clause quoted above
precludes Plaintiff's claims.  This argument is logical and
appealing.  And, in fact, several bankruptcy and appellate courts
have ruled this way, based on state law.  See <u>Margaux Warren Park</u>

Page -34-

Partners, Ltd. v. GE Business Financial Services, Inc. (In re Margaux Warren Park Partners, Ltd.), 2009 WL 5061806 at *5 (Bankr. E.D. Tex. 2009):

> The existence of merger clauses both in the Loan Agreement and in the negotiating agreement bars all of Plaintiff's fraud claims as a matter of law. ... These merger clauses are effective to bar all of Plaintiff's fraud claims because they were clear and unequivocal expressions of intent, by two sophisticated and knowledgeable parties, represented by counsel and dealing at arms length, to disclaim reliance on such alleged representations beyond the terms of the Loan Agreement and the negotiating agreement.

(Citations omitted) and Hovis v. General Dynamics Corp. (In re Marine Energy Systems Corp.), 396 B.R. 895, 908-15 (D. S.C. 2007), aff'd, 299 Fed. Appx. 222 (4th Cir. 2008)(District Court examines "anti-reliance" provisions in a confidentiality agreement and asset purchase agreement and finds that under South Carolina law, New York law, and Delaware law, Plaintiff was not entitled to pursue fraud claims.)

In this instance, the merger clause is somewhat minimal, and it is certainly questionable whether in the context of the merger clause Plaintiff intended that it be precluded from asserting fraud or reliance on any alleged fraud by Defendant.  For example, Recital 2 of Plaintiff's Trial Exhibit 2 raises explicitly "potential misrepresentation or fraud" and contemplates the possibility of a subsequent action for that. Thus the language of the merger clause should probably not be construed as an "anti-reliance" provision, notwithstanding that

Page  -35-

it was Plaintiff's member that drafted the merger clause.  This Court did not discover any New Mexico cases directly on point. But see Wilburn v. Stewart, 110 N.M. 268, 270, 794 P.2d 1197, 1199 (1990)("We ... hold that parol evidence is admissible to show any misrepresentation that induced the parties to contract, whether they are fraudulent, negligent, or innocent.")(Citation omitted.) Based on the rulings on Defendant's other arguments, however, it is not necessary for the Court to predict how New Mexico would rule on this argument at this time.

**B.      The "Tort Claim", section 523(a)(2)(A).**

The Court concludes that Plaintiff has not proved reliance, justifiable reliance or causation by a preponderance of the evidence.  The section 523(a)(2)(A) claim will be dismissed.

**B1.   Reliance and Justifiable Reliance.**

In Field the United States Supreme Court opined that section 523(a)(2)(A) was designed to deal with the common law torts of false pretenses, false representation, and fraud.  Field, 516 U.S. at 69.  Congress could have enumerated the elements of these causes of action but did not.  Id.  This suggests that Congress meant to incorporate the established common law meanings of these terms.  Id. (citation omitted).  The Court then looked to the Restatement (Second) of Torts (1976) ("Restatement") as definitive of the meanings:

> The section on point [in the Restatement] dealing with
> fraudulent misrepresentation states that both actual

and "justifiable" reliance are required. [Restatement (Second) of Torts] § 537. The Restatement expounds upon justifiable reliance by explaining that a person is justified in relying on a representation of fact "although he might have ascertained the falsity of the representation had he made an investigation." Id., § 540. Significantly for our purposes, the illustration is given of a seller of land who says it is free of encumbrances; according to the Restatement, a buyer's reliance on this factual representation is justifiable, even if he could have "walk[ed] across the street to the office of the register of deeds in the courthouse" and easily have learned of an unsatisfied mortgage. Id., § 540, Illustration 1. ... Here a contrast between a justifiable and reasonable reliance is clear: "Although the plaintiff's reliance on the misrepresentation must be justifiable ... this does not mean that his conduct must conform to the standard of the reasonable man. Justification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases." Id., § 545A, Comment b. Justifiability is not without some limits, however. As a comment to § 541 explains, a person is "required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation. Thus, if one induces another to buy a horse by representing it to be sound, the purchaser cannot recover even though the horse has but one eye, if the horse is shown to the purchaser before he buys it and the slightest inspection would have disclosed the defect. On the other hand, the rule stated in this Section applies only when the recipient of the misrepresentation is capable of appreciating its falsity at the time by the use of his senses.

Id. at 70-71. The Court then continued to examine the modern authorities on tort law:

Similarly, the edition of Prosser's Law of Torts available in 1978 (as well as its current successor) states that justifiable reliance is the standard applicable to a victim's conduct in cases of alleged misrepresentation and that "[i]t is only where, under

Page -37-

the circumstances, the facts should be apparent to one
of his knowledge and intelligence from a cursory
glance, or he has discovered something which should
serve as a warning that he is being deceived, that he
is required to make an investigation of his own." W.
Prosser, Law of Torts § 108, p. 718 (4th ed. 1971);
(footnotes omitted); <u>accord</u>, W. Keeton, D. Dobbs, R.
Keeton, & D. Owen, Prosser and Keeton on Law of Torts §
108, p. 752 (5th ed. 1984) (Prosser & Keeton). Prosser
represents common-law authority as rejecting the
reasonable person standard here, stating that "the
matter seems to turn upon an individual standard of the
plaintiff's own capacity and the knowledge which he
has, or which may fairly be charged against him from
the facts within his observation in the light of his
individual case." Prosser, supra, § 108, at 717;
<u>accord</u>, Prosser & Keeton, § 108, at 751[.]

<u>Id.</u> at 71-72. The Court ruled that for section 523(a)(2)(A)

purposes a plaintiff must prove justifiable, but not reasonable,

reliance. <u>Id.</u> at 74.

The Plaintiff is an LLC composed of three members that are

intelligent, well educated, and very experienced in real estate

matters. One is a real estate broker and real estate attorney.

Plaintiff has experience in making loans for distressed

properties owned by individuals under the extreme stress of the

threat of losing their homes. Plaintiff should be held to this

level of capacity, knowledge and sophistication.

First, the Court finds that Plaintiff did not actually rely

on any representations by Defendant. Instead, it relied on

either 1) the 360[27]% interest rate it demanded which was supported

---

[27]Calculated as follows: $75,000 interest ÷ 30 days = $2,500
per day. $2,500 per day * 360 day year = $900,000 interest for
(continued...)

by everyones' expectation that the refinance would come through very shortly, or 2) the real possibility of a windfall return of one-half of the Simms Building.  It was very clear to the Court that the only factors that were of any importance to Plaintiff were the value of the Simms Building, the building's ability to cash flow, and Plaintiff's ability to obtain a one-half interest. The two members that testified stated that they relied as little on Defendant as possible, they did not know him or his business, and they relied on "the deed."

Second, the Court finds that any reliance by Plaintiff would not have been justified under the circumstances.  As the Supreme Court has explained, a duty to investigate can arise when the surrounding circumstances give rise to red flags that merit further investigation.  See Field, 516 U.S. at 72.  Thus, when the circumstances are such that they should warn a creditor that he is being deceived, he cannot justifiably rely on the fraudulent statements without further investigation.  Considering

---

[27](...continued)
one year. $900,000 interest ÷ $250,000 principal = 3.6 = 360%. (In fact, this calculation significantly understates the interest rate, since the first advance of $100,000 was delivered two days after the execution of the documents on June 23 and the second advance of $150,000 was delivered six days after the execution of the documents.)  The $30,000 for a 46-hour extension constituted a much higher interest rate.  Rounding the 46 hours up to 48 for ease of calculation, $30,000 interest ÷ 2 days = $15,000/day * 360 day year = 2,160% per annum.

Plaintiff's level of sophistication the following "red flags" should have been obvious:

1. How is it conceivable that someone with a net worth of over $7.9 million would be out in the alternative financing market trying to borrow money at a 360% interest rate?

2. If the Simms Building were truly worth $12.8 million, why would the previous owners have sold it to JTS Simms for only $7 million? Isn't an actual arms length sales price the best indication of value? If the building only had a $7 million value, and Plaintiffs knew that Silar had a $6.5 million mortgage, how could Plaintiff believe there was a huge equity?

3. Why would an experienced real estate investor with great net worth offer a warranty deed to a property (as opposed to only a lien interest) with a supposed net worth of several millions as security for a $250,000 loan?

4. Didn't the extreme time pressures to close the loan suggest to Plaintiff a certain desperation on Defendant's part?

Plaintiff admits it knew neither the Defendant nor his business[28].

---

[28]When a lender is sophisticated, the sums involved are significant, and lender has no history with borrower, the lender cannot justifiably rely on information only from the borrower. Columbo Bank, FSB v. Sharp (In re Sharp), 2007 WL 2898704 at *4 (Bankr. M.D. Md. 2007), subsequently aff'd, 340 Fed. Appx. 899, 907 (4th Cir. 2009). Compare Johnson v. Riebesell (In re Riebesell), 586 F.3d 782, 792 (10th Cir. 2009)(It was justifiable for plaintiff to initially rely on debtor because he was a long-standing friend and client and plaintiff already trusted him. However, plaintiff was a competent businessman who was aware that
(continued...)

Case 08-01124-s   Doc 22   Filed 09/21/10   Entered 09/21/10 14:08:02 Page 40 of 53

Wasn't Plaintiff curious of how and why Defendant's situation had deteriorated to this point?

5.    The Court finds it more likely than not that Plaintiff had the Silar mortgage in its possession before the loan closed. Plaintiff was not justified in relying on an assumption that Mr. Silva had read it and that Mr. Silva's reading of the Silva mortgage precluded Plaintiff's members from needing to read the mortgage themselves.

6.    The deal was too good to be true[29].

7.    Why didn't Plaintiff take Defendant's word for it when he stated he was out of cash and could not pay his obligations without a 360% loan?

8.    If Plaintiff believed Defendant's allegations of net worth why did it not insist on a personal guarantee?

9.    Defendant sent an e-mail to Plaintiff that contained warnings that any ownership interest in or loan to JTS Simms

---

[28](...continued)
debtor's financial condition was declining, so further extensions of credit were not justifiable.) ("Even under the 'justifiable' test, however, the plaintiff must 'use his senses' and at least make 'a cursory examination or investigation' of the facts of the transaction before entering into it.")(Citing <u>Field</u>, 516 U.S. at 71.)

[29]<u>See</u> <u>Johnson v. Curtis (In re Curtis)</u>, 2006 WL 1506209 at *10 (Bankr. C.D. Ill. 2006)(Promises of high returns – in this case 100% in 15 days – on investments that seem too good to be true usually turn out to be too good to be true.)(Citing <u>U.S. v. Frykholm</u>, 362 F.3d 413, 414 (7th Cir.), <u>cert. denied</u>, 543 U.S. 928 (2004)(Ponzi scheme)).

Page  -41-

might turn out to be worthless, the interests might not ever be transferrable, and that JTS Simms had no operating history.

In summary, the Court finds that Plaintiff 1) did not actually rely on any of Defendant's representations and 2) if it had, it would not have been justifiable.

**B2.  Loss Causation.**

One element of a section 523(a)(2)(A) claims is the proof that the debtor's representation _caused_ the creditor to sustain a loss.  Young, 91 F.3d at 1373.

> As Field teaches, § 523(a)(2) requirements must be determined under common law tort principles.  For this reason, a damage requirement is uniformly read into § 523(a)(2)(A), even though no express inclusion of such a requirement appears in the text of that Code section.  We attribute the presence of the requirement that "resulting injury" proximately caused by alleged fraudulent conduct is included as a requirement in a § 523(a)(2)(A) claim to the fact that this is an element which is necessary for the proof of common law fraud generally.

Woodstock Housing Corp. v. Johnson (In re Johnson), 242 B.R. 283, 292 (Bankr. E.D. Pa. 1999).  See also Domann v. Vigil, 261 F.3d 980, 984 (10th Cir. 2001)("[U]nder New Mexico law, proximate cause is a necessary element to any recovery in tort.")(Citation omitted.)  Accord Cain v. Champion Window Co. of Albuquerque, LLC, 2007-NMCA-085, ¶25, 142 N.M. 209, 216, 164 P.3d 90, 97 (Ct. App. 2007)(A defendant is liable for damages proximately caused by fraudulent misrepresentation.)(Citing UJI 13-1633 NMRA.)

To prove fraud under the Restatement, a plaintiff must prove "proximate causation", which consists of both "causation in fact" and "legal causation." See Gem Ravioli, Inc. v. Creta (In re Creta), 271 B.R. 214, 219 (1st Cir. BAP 2002).

"Causation in fact" requires that the plaintiff's reliance on the misrepresentations be a "substantial factor in determining the course of the conduct that results in [the] loss." Restatement § 546.

> [Section 546] is concerned with the question of whether the misrepresentation made by the defendant has caused the plaintiff's loss at all.
> ...
> If the misrepresentation has not in fact been relied upon by the recipient in entering into a transaction in which he suffers pecuniary loss, the misrepresentation is not in fact a cause of the loss under the rule stated in this Section. If the misrepresentation has in fact induced the recipient to enter into the transaction, there is causation in fact of the loss suffered in the transaction; and the question becomes one of whether the loss is of a kind for which the maker is legally responsible.

Id., cmt. a.

"A fraudulent misrepresentation is a legal cause of a pecuniary loss resulting from action or inaction in reliance upon it if, but only if, the loss might reasonably be expected to result from the reliance." Id. § 548A.

> Not all losses that in fact result from the reliance are, however, legally caused by the representation. In general, the misrepresentation is a legal cause only of those pecuniary losses that are within the foreseeable risk of harm that it creates.
> ...

Page -43-

Pecuniary losses that could not reasonably be expected
    to result from the misrepresentation are, in general,
    not legally caused by it and are beyond the scope of
    the maker's liability. This means that the matter
    misrepresented must be considered in the light of its
    tendency to cause those losses and the likelihood that
    they will follow.

Id., cmts. a and b.

The distinction between these two types of causation is

found in Liebowitz v. Great American Group, Inc. (In re

Goldblatt's Bargain Stores, Inc.), 559 F.3d 644, 647 (7th Cir.

2009). In Goldblatt's the Debtor entered into an agreement with

Great American Group ("GAG") to purchase inventory from two

stores it was closing. It was keeping four other stores open.

Under the agreement, GAG would buy the inventory for a percentage

of Debtor's cost. An independent inventory service would then

value the inventory and, if GAG had overpaid, it would be

entitled to a refund of the overpaid amount. LaSalle Bank,

debtor's lender, approved. Goldblatt's, 559 F.3d at 646. Before

the transaction closed, for unstated reasons, Debtor transferred

an additional $450,000 of inventory to the two stores that were

to be closed. GAG knew of this transfer but did not inform

LaSalle. Id.

Later, Debtor decided to close its remaining stores and

entered the same agreement with GAG. Again LaSalle consented and

also agreed to reimburse GAG if it overpaid. The inventory

service determined that the inventory was worth $2 million less

Page -44-

than represented.  GAG sought a refund of approximately $1 million from LaSalle.  LaSalle refused to pay on its indemnification claiming that GAG had committed fraud.  Id.

The bankruptcy court found that GAG had a duty to reveal the inventory transfer.  Id.  Its silence constituted fraud.  Id. at 647.  But, the bankruptcy court also concluded that LaSalle would not have acted any differently had it known of the transfer. And, it concluded that LaSalle did not prove any loss from the fact that the inventory was transferred.  Id.  The bankruptcy court entered a $1.09 million judgment against LaSalle in favor of GAG.

LaSalle appealed.  The district court reversed, finding that the fraud excused LaSalle's performance.  Id.

The Court of Appeals for the Seventh Circuit reversed the district court and remanded for reinstatement of the bankruptcy court's judgment.  It ruled as follows:

> A legal remedy, whether rescission or damages, does not follow automatically from the existence of a false statement or material omission.  There must be reliance, which is often called transaction causation, and injury, which is often called loss causation.  See Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005). (Dura Pharmaceuticals was decided under federal securities law, but Illinois and most other states also follow this approach.)  See, e.g., Oliveira v. Amoco Oil Co., 201 Ill.2d 134, 267 Ill.Dec. 14, 776 N.E.2d 151 (2002); Restatement (Second) of Torts §§ 525, 546, 548A.)  The bankruptcy judge found that LaSalle Bank had not demonstrated either transaction causation or loss causation.  It tried to show reliance by contending that it would have insisted that Goldblatt's use a

Page  -45-

different liquidator had it known that Great American
Group had failed to reveal a material fact. The
bankruptcy judge did not believe this, however,
remarking that the evidence did not establish that any
other firm would have offered the Bank better terms-and
the Bank's obligations to its own investors demanded
that it take the best deal available. LaSalle Bank did
not even try to establish loss causation: It did not
contend that the omission had anything to do with the
sum that Great American Group wanted to recover, or
that the movement of inventory among stores reduced the
aggregate price received from the two sales to Great
American Group.

Id. at 648-49.

Another example of "loss causation" is found in the Seventh

Circuit securities fraud case[30] of Bastian v. Petren Resources

Corp., 892 F.2d 680 (7th Cir.), cert. denied, 496 U.S. 906

(1990). "In 1981 the plaintiffs invested $600,000 in oil and gas

limited partnerships promoted by the defendants. The plaintiffs

allege that, had it not been for the offering memoranda's

misrepresentations and misleading omissions concerning the

defendants' competence and integrity, the plaintiffs would not

have invested in these partnerships, which by 1984 were

worthless." Id. at 682. The district court dismissed for

failure to allege "loss causation."

_____

[30]The Seventh Circuit commented that "loss causation" is the
same standard common law fraud rule borrowed for use in
securities fraud cases. Bastian, 892 F.2d at 683-84. It is an
instance of the common law's requirement that a tort plaintiff
prove causation. Id. "No hurt, no tort." Id. (Citation
omitted.) Since a securities law analysis of loss causation is
based on common law, that analysis should apply equally to common
law, non-securities law cases.

The Seventh Circuit described Plaintiff's argument as follows:

> The plaintiffs argue that they should not be required to allege that, but for the circumstances that the fraud concealed, the investment that they were induced by the fraud to make would not have lost its value. They say it should be enough to allege that they would not have invested but for the fraud; for if they had not invested, they would not have lost their money, and the fraud was therefore the cause of their loss. They say they have no idea why their investment was wiped out and it does not matter; the defendants, being responsible for the disaster by having used fraud to induce the investment, must not be allowed to get off scot-free just because the plaintiffs do not know how the investment would have fared in the marketplace had the facts about the defendants' competence and integrity been as represented. As a fallback position the plaintiffs argue that the defendants should have the burden of proving what part (if any) of the loss would have occurred even if the defendants had been as competent and honest as represented.

Id. at 683. The Court commented on plaintiff's arguments:

> The plaintiffs alleged that they invested in the defendants' limited partnerships because of the defendants' misrepresentations, and that their investment was wiped out. But they suggest no reason why the investment was wiped out. They have alleged the cause of their entering into the transaction in which they lost money but not the cause of the transaction's turning out to be a losing one.

Id. at 684. The court rejected the arguments:

> If the plaintiffs would have lost their investment regardless of the fraud, any award of damages to them would be a windfall.
> ...
> "Loss causation" is an exotic name-perhaps an unhappy one, for the standard rule of tort law that the plaintiff must allege and prove that, but for the defendant's wrongdoing, the plaintiff would not have incurred the harm of which he complains. Like a stock-market crash, the collapse of oil prices in the

Page -47-

early 1980s reverberated throughout the economy.  Since
the United States is a net importer of oil, the
reverberations were for the most part good ones.  But
there were some losers.  No social purpose would be
served by encouraging everyone who suffers an
investment loss because of an unanticipated change in
market conditions to pick through offering memoranda
with a fine-tooth comb in the hope of uncovering a
misrepresentation.  Defrauders are a bad lot and should
be punished, but Rule 10b-5 does not make them insurers
against national economic calamities.  If the
defendants' oil and gas ventures failed not because of
the personal shortcomings that the defendants concealed
but because of industry-wide phenomena that destroyed
all or most such ventures, then the plaintiffs, given
their demonstrated desire to invest in such ventures,
lost nothing by reason of the defendants' fraud and
have no claim to damages.

Id. at 684-85. (Citations omitted.)  The Seventh Circuit affirmed

dismissal of the case.

The two cases discussed above indicate that a Plaintiff must

demonstrate a direct link between the misrepresentation and the

actual damages suffered.  "But for" causation alone is not

enough.  See, e.g., U.S. v. St. Louis University, 336 F.3d 294,

302 (4th Cir.), cert. denied, 540 U.S. 1050 (2003)(SLU's claim

against the government requires evidence of proximate cause in

addition to evidence of but-for causation.)  See also Citibank,

N.A. v. K-H Corp., 968 F.2d 1489, 1496-97 (2nd Cir. 1992):

> Citibank argues that under New York law, proximate
> causation is satisfactorily pleaded in a suit for
> common law fraud by a lender, when the lender alleges
> that (a) it would not have financed a transaction
> but-for the alleged misrepresentation, and (b) the
> financing was not repaid.
> ...
> We agree with the district court, however, that
> Citibank did not adequately allege that the damages it

suffered were proximately caused by the alleged
misrepresentations of Fruehauf and Kelsey-Hayes, and
that the fourth amended complaint failed to allege
adequately a causal connection between the
non-disclosure of the promissory note and the
subsequent decline in the value of the securities
pledged by Stoecker and GAIL as collateral to Citibank.

and Parker v. Grant (In re Grant), 237 B.R. 97, 118 (Bankr. E.D.

Va. 1999)(A doctor's representation that he was married, made in

order to obtain a lease, was not a causal connection to later

physical damages and lost rents.  "The damages complained of

rather appear to be the result of causes wholly unrelated to the

misrepresentation of marital status."); and Kaufman v. Vamvakaris

(In re Vamvakaris), 197 B.R. 228, 230 (Bankr. E.D. Va. 1996)(A

debtor's misrepresentation that he had insurance was not the

proximate cause of plaintiff's loss, which was theft.) Compare

Hemi Group, LLC v. City of New York, N.Y., ___ U.S. ___, 130

S.Ct. 983, 989 (2010)(RICO case):

> [T]o state a claim under civil RICO, the plaintiff is
> required to show that a RICO predicate offense "not
> only was a 'but for' cause of his injury, but was the
> proximate cause as well." [Holmes v. Securities
> Investor Protection Corporation, 503 U.S. 258 (1992),]
> at 268, 112 S.Ct. 1311.  Proximate cause for RICO
> purposes, we made clear, should be evaluated in light
> of its common-law foundations; proximate cause thus
> requires "some direct relation between the injury
> asserted and the injurious conduct alleged." Ibid.  A
> link that is "too remote," "purely contingent," or
> "indirec[t]" is insufficient.  Id., at 271, 274, 112
> S.Ct. 1311.

In the case before the Court, Plaintiff has adequately

proved why it loaned the money, but has completely failed to

Page -49-

prove how any misrepresentations caused its loss.  Plaintiff was aware of the high risk nature of the transaction, but nevertheless proceeded with it.  The Court finds that Plaintiff's loss was caused by the foreclosure of the Simms Building and not by any representation made to it.  Therefore, the Section 523(a)(2)(A) claim will be dismissed.

## C.   False Financial Statement, section 523(a)(2)(B).

The Court concludes that Plaintiff has not proved actual or reasonable reliance on the financial statement by a preponderance of the evidence.  As discussed above, the Court found that Plaintiff did not actually rely on anything represented by Defendant.  This also includes the personal financial statement.  Furthermore, the "red flags" discussed above apply equally to the section 523(a)(2)(B) claim.  See First Nat'l Bank v. Cribbs (In re Cribbs), 327 B.R. 668, 675 (10th Cir. BAP 2005), aff'd, 2006 WL 1875366 (10th Cir. 2006)(Unpublished opinion.)(The court found no reasonable reliance.  "Despite obvious inconsistencies" in financial statement the bank made no investigation.  "A creditor has a responsibility to ensure there exists some basis for reliance on the debtor's representations.") (Citation omitted.)

There is another red flag concerning the personal financial statement as well.  Mr. McKinnon testified that he knew the financial statement was out of date and that Defendant no longer had any cash.  Defendant had also told them he was out of cash,

unable to pay his debts timely and was relying on the refinancing
of an asset that he did not even own (JTS Simms owned the
Property) to get him out of the bad situation in which he found
himself.  This suggests big trouble.  Furthermore, even a cursory
review of the financial statement would show that there were no
other sources of liquidity to repay debts.  Any reliance by
Plaintiff would not have been reasonable.

Since Plaintiff could not establish actual or justifiable
reliance it cannot prove reasonable reliance, a higher standard,
on the same evidence.  The Section 523(a)(2)(B) claim will also
be dismissed.

**CONCLUSION**

From an overall perspective, it is quite clear that
Plaintiff's members viewed this proposal as an opportunity that
had virtually no downside.  At worst, if Defendant performed,
Plaintiff would earn a 30% return on its $250,000 within 30 days,
or a 42% return within almost 32 days.  At best, Defendant would
default and Plaintiff would obtain perhaps $3 million of equity
in the well known Simms Building for a mere $250,000.  It was the
latter prospect in particular that dazzled Plaintiff's members
and had them planning on where the offices for themselves and new
tenants would be located in the building – part of what they
characterized as "due diligence" – after they had committed the
funds and advanced the first $100,000.  Indeed, Plaintiff's Trial

Exhibit 2, the agreement, is written almost as if Plaintiff was already a part owner of the building.  And this was why as well the members did not record the transaction with the Bernalillo County Clerk's office, why they sent the letter to Silar asserting they did not hold a lien on the Property (Defendants' trial exhibit R), why the documentation did not reflect the $7 million mortgage lien of Silar, and perhaps why they overlooked the fact that the promissory note was from JTS Properties rather than JTS Simms.  Plaintiff's members were not neophytes, nor, to their credit, did they claim to be.  Whatever reliance the members in reality placed on Defendant's representations, it fell far below anything that would support a ruling of justifiable or reasonable reliance on the statements of Troy Baillio.

For all of the reasons stated, the Court will grant Defendant's oral motion to dismiss pursuant to Rule 52(c) and dismiss this adversary proceeding by separate Order.

Honorable James S. Starzynski
United States Bankruptcy Judge

Date Entered on Docket:  September 21, 2010

Copies to:

Chris W Pierce
Hunt & Davis, P.C.
2632 Mesilla St NE
Albuquerque, NM 87110

George M Moore
Moore, Berkson & Gandarilla, P.C.
PO Box 7459
Albuquerque, NM 87194